GULOTTA, Judge.
Plaintiff appeals from a judgment granting defendant’s motion for summary judgment. We affirm.
Plaintiff’s claim is for the balance allegedly owed by Superior Oil for its pro rata share of costs incurred in connection with the joint operation of the construction and drilling of a well which resulted in a dry hole. Forest and Superior, as well as others not parties to this suit, entered into a contract providing for the drilling for minerals on land in St. Landry Parish. This Joint Operating Agreement (JOA), furnished by Forest and executed by all parties, governed the relationship of the parties and set forth the extent in which which the expenses of drilling and exploration were to be borne. Forest was designated as “Operator” and charged with the responsibility of managing, developing and operating the well. The contract provided that the Operator was to pay all costs and expenses of the operation and was to bill each of the Non-Operators (Superior and others) for its proportionate share of the expenses. Superior’s share was set at approximately 44.17% of the total cost. The estimated costs for drilling a dry hole were set at $636,875.00 and for a producer at $925,-575.00. These cost estimates were included in an “Authorization for Expenditure” (AFE) request which was transmitted by plaintiff to the Non-Operating parties. The authorization was approved and the drilling of the well commenced.
*760 The primary dispute revolves around the interpretation of Article VII. of the JOA.[1] According to this provision, any expenditure in excess of 150% of the “original estimated cost of the well consented to, as set out in the AFE issued by Operator” requires the consent of the Non-Operator. Specifically, the issue is whether Article VII. necessitated Superior’s consent to certain expenditures made by Forest in setting pipe, perforating and testing sands (defined later herein as initial steps taken toward completion of the well), and conducting other operations subsequent to February 9, 1972 (when defendant refused to give consent to further expenditures), but before the well was plugged and abandoned as a dry hole on March 21, 1972.
The JOA became effective September 1, 1971. On January 13, 1972, Forest sought and received consent from the Non-Operators for additional expenditures.[2] On January 26, further consent for additional expenditures required for deepening the well was sought and obtained from the Non-Operators.
The crucial exchange of telegrams giving rise to this suit occurred in February, 1972. On February 8, Forest notified Superior that a depth of 17,500 feet had been reached and recommended additional casing, perforating and testing operations at an additional estimated cost. The communication stated that under Article VII. each party had 24 hours within which to elect to cease or to continue participation. On February 9, Superior elected not to participate in the February 8 proposal and notified Forest of its decision. Forest conducted the unsuccessful operations. Despite the February 9 telegram, Forest billed Superior for its proportionate share of the costs of the well incurred subsequent to February 9. Superior’s refusal to pay resulted in this litigation.
COMPLETION OPERATIONS
We reject plaintiff’s contention that the expenditures proposed in the February 8 telegram were in connection with completion operations; and, according to the terms of the JOA, that no prior authorization for expenditure was necessary.[3] It is true that Article VII. of the JOA provides:
“ * * * Upon Non-Operators’ consent to the drilling of a well, Operator shall not be required to obtain Non-Operators’ consent to the separate items of *761 expense incurred by Operator in . completing said well . . . ”
However, Article VII. also contains the following proviso:
“ * * * . . . provided further, however, without the further consent of Non-Operators, expenditures may not be made in excess of one hundred fifty percent (150%) of the original estimated cost of the well consented to, as set out in the AFE issued by Operator. * * * ”
When we read the above quoted sections in pari materia, we interpret Article VII. to require consent from the Non-Operator when the completion costs exceed 150% of the original AFE.
ORIGINAL OR SUPPLEMENTAL AFE
However, plaintiff contends that the expenses in question did not exceed 150% of the supplemental authorization for expenditures and, therefore, did not require consent by the Non-Operator in accordance with Article VII. It is plaintiff’s position that the consent required in Article VII. is for expenditures in excess of 150% of the sum of the original AFE and any supplemental AFE.[4] While acknowledging that Article VII. refers to “original estimated cost” and “original AFE”, plaintiff contends that the word “original” must be given a descriptive rather than a restrictive reading. Further, plaintiff observes that the full phrase used in the JO A is “original estimated cost of the well consented to, as set out in the AFE issued by Operator.” To restrict the meaning of this phrase to the original AFE, it argues, would be to render the words “consented to” meaningless. It contends, therefore, that the entire phrase means, for the purposes requiring consent of a Non-Operator, that the original AFE and any supplemental “consented to” costs are to be added and the 150% rule applied to that sum. We do not agree.
The language of Article VII. is clear and unambiguous. The words “consented to” in the first paragraph of Article VII. (see footnote 1.) do not modify the phrase “cost of the well” as plaintiff argues; but rather, they modify the word “well”. Article VII. begins “No well or wells shall be drilled for the joint account . . . without the consent of Non-Operators.” Clearly, the words “consented to” refer to the “well”, the drilling of which has been authorized by the Non-Operators. Furthermore, the first sentence of the final paragraph of Article VII. reads:
“As soon as feasible after Operator revises its estimate of the total cost of any well to the effect that its cost, as revised, will be in excess of one hundred fifty percent (150%) of the estimated cost of the well as set out in the original AFE issued by Operator, Operator shall notify all parties participating in the drilling of such well. * * * ” (emphasis ours)
We conclude, therefore, for the purpose of applying the 150% rule, that the phrase “original estimated cost” means the original AFE and not a supplemental AFE as argued by plaintiff.
AFE FOR PRODUCER OR DRY HOLE
Finally, we reject plaintiff’s further contention that no authorization was necessary for the expenditures proposed in the February 8 telegram because they, when added to the actual expenditures to that date, were not in excess of 150% of the original AFE for a producer.[5] Plaintiff *762 correctly points out that the operations of perforating, acidizing and casing set forth in the February 8 telegram are operations which appear only in the producer column of the original AFE. According to plaintiff, therefore, the original AFE for a producer is the amount ($925,575.00) that should be used in ascertaining whether or not the 150% limitation clause of the agreement is applicable. We do not agree. Plaintiff’s argument, while appearing to have merit, overlooks a basic, pertinent fact, i. e., that the operation, in this case, resulted in a “dry hole”. Furthermore, as defendant argues, the operations proposed in the February 8 telegram are only part of the full completion operations set forth in the producer column of the original AFE. In an uncontradicted affidavit, Raymond Kerr of Superior states that the difference between the AFE for a dry hole and the AFE for a producer is the estimated cost of testing and completing the well; and that two-thirds (%) of this estimated cost relates to operations and expenses “which would only be incurred as incidental to producing hydrocarbons from the well”. Because the well in this case was dry, these operations were never performed. The difference between the original AFE for a dry hole and a producer is $288,000.00. Kerr avers, therefore, that the costs of the operations set forth in the February 8 telegram could not exceed $100,000.00. When we consider Kerr’s affidavit, together with the fact that the operation resulted in a “dry hole” and the additional fact that the total estimated amount for a producer was not expended, we cannot conclude (as argued by plaintiff) that the estimated cost of a producer should be the base figure upon which to apply the 150% limitation clause of the agreement. We are further persuaded by the additional fact (upon which both parties to the litigation agree) that some testing and completion attempts are usually made in order to determine whether a well is a producer or a dry hole.
On the other hand, because some completion costs were contemplated to be expended and are not listed in the “dry hole” column, these completion costs expended ($100,000.00) prior to ascertaining that the operation was a “dry hole” must be added to the dry hole costs ($636,875.00) as listed in the AFE. This sum total is “the original estimated cost of the well” within the meaning of Article VII. of the JOA.[6] The expenditures proposed in the February 8 telegram when added to the estimated costs of the actual expenditures to that date resulted in a total in excess of 150% of the “original estimated cost of the well” and, according to the unambiguous language of Article VIL, Superior had the right to elect to cease participation in the well. In its timely reply telegram, Superior did, in fact, elect not to participate. Under the circumstances, plaintiff is not entitled to recover from Superior any part of the amount expended subsequent to Superior’s non-consent.
The judgment is affirmed.

AFFIRMED.

.Article VII. of the JOA, in pertinent part, provides:
VII.

LIMITATION ON EXPENDITURES

“No well or wells shall be drilled for the joint account or any expenses incurred therefor by Operator on the subject leases in excess of TEN THOUSAND and NO/100 DOLLARS ($10,000.00) without the consent of Non-Operators. Upon Non-Operators’ consent to the drilling of a well, Operator shall not be required to obtain Non-Operators’ consent to the separate items of expense incurred by Operator in drilling, testing and completing said well; . provided further, however, without the further consent of Non-Operators, expenditures may not be made in excess of one hundred fifty percent (150%) of the original estimated cost of the well consented to, as set out in the AFE issued by Operator. * * *
$ ‡ $ 4: ‡ ‡
“As soon as feasible after Operator revises its estimate of the total cost of any well to the effect that its cost, as revised, will be in excess of one hundred fifty percent (150%) of the estimated cost of the well as set out in the original AFE issued by Operator, Operator shall notify all parties participating in the drilling of such well. Upon receipt of such notice, each party shall have twenty-four (24) hours, exclusive of Saturday, Sunday, or holidays, within which to elect to cease or continue participating in the well. * * * ”

. The expenses proposed in the January 13 telegram amounted to $109,450.00. As of that date, an estimated $900,065.00 had already been spent in drilling the well. The sum of these two figures was $1,009,515.00, an amount in excess of 150% of the original AFE for a dry hole of $636,875.00. The supplemental AFE furnished by Forest reflected the $372,640.00 in excess of the original AFE.

. According to the uncontested affidavit of Raymond Kerr, assistant chief engineer of Superior, perforating, testing, acidizing and casing operations, such as those set forth in the February 8 telegram, “may be referred to in the oil and gas industry as either additional testing preceding a completion attempt or one of the initial stages of a completion attempt”.

. According to plaintiff, the sum of the original AFE ($636,875.00) for a dry hole and the supplemental expenditures of $372,640.00 (consented to on January 14 by Superior) is $1,009,-515.00. One hundred fifty percent (150%) of this figure is $1,514,272.50. Plaintiff argues, therefore, that the $77,000.00 expenditure proposed on February 8 when added to the actual expenditures of that date ($1,125,192.88) totals a sum which is below the $1,514,272.50 figure.

. The original AFE for a producer was $925,-575.00. One hundred fifty percent (150%) of this figure is $1,388,362.50. According to the uncontested affidavit of J. J. Bugno, comptroller of Superior Oil, the actual expenditures of the venture prior to February 8 were $1,125,-192.88. The expenditure of $77,000.00 proposed in the February 8 telegram when added to the actual costs prior to February 8 results in a total of $1,202,192.88, a figure considerably below 150% of the original AFE for a producer.

. The original AFE for a dry hole is $636,-875.00. According to Kerr’s affidavit, the maximum. cost of the expenditures proposed in the February 8 telegram would be $100,000.00. Adding this figure to the original AFE for a dry hole, we arrive at the sum of $736,875.00. One hundred fifty percent (150%) of this figure is $1,105,302.50. According to Bugno, the actual expenditures in the well operation up to 2:00 p. m., February 9, amounted to $1,125,192.88. The sum of this figure and $77,000.00, the proposed expenditures set forth in the telegram, is $1,202,192.88, a figure in excess of $1,105,-302.50.